## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
## WESTERN DIVISION

**MATTHEW ENDERLIN**                                                      **PLAINTIFF**

**v.**                              **CASE NO. 4:06-CV-0032 GTE**

**XM SATELLITE RADIO HOLDINGS, INC.,**
**XM SATELLITE RADIO, INC.**                                           **DEFENDANTS**

### ORDER

Presently before the Court is the Defendants' Motion to Dismiss, or Alternatively, To Stay.

### I.     BACKGROUND

Plaintiff Matthew Enderlin brings this purported class action lawsuit against Defendants XM Satellite Radio Holdings, Inc. and XM Satellite Radio, Inc. for violations of the Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-101 et seq. seeking injunctive relief, as well as compensatory and punitive damages.  Defendants contend that Plaintiff's claims are subject to arbitration, pursuant to the Customer Service Agreement (the "Agreement") that it entered into with Mr. Enderlin.

Section 11(b) of the Agreement (also referred to as the "original Agreement") sets forth the arbitration clause, which states:

**b) Formal Resolution**.
Except as provided in Section 11(c), if we cannot resolve a Claim informally, any Claim either of us asserts will be resolved only by binding arbitration. The arbitration will be conducted under the Commercial Arbitration Rules of the American Arbitration Association ("AAA Rules") that are in effect at the time the arbitration is initiated and under the rules set forth in this Agreement. If there is a conflict between the AAA Rules and the rules set forth in this Agreement, the rules set forth in this Agreement will govern. ARBITRATION MEANS THAT

1

YOU WAIVE YOUR RIGHT TO A JURY TRIAL. If you initiate an arbitration, you agree to pay a fee of $125 or, if less and you tell us in writing, the amount that you would pay to initiate a lawsuit against us in the appropriate court of your state.  We agree to pay any additional fee or deposit required by the American Arbitration Association in excess of your filing fee.  We also agree to pay the costs of the arbitration proceeding up to a maximum of one-half day (four hours) of hearings.  Other fees, such as attorney's fees, expenses or travel to the arbitration and the costs of a proceeding that goes beyond one-half day will be with AAA rules.  The arbitration will be held at a location within 100 miles of your residence unless you and we both agree to another location.  To start the arbitration, you or we must do the following things:

    i.      Write a demand for arbitration.  The demand must include a description of the Claim and the amount of damages sought to be recovered;

    ii.      Send three copies of the demand for arbitration plus the appropriate filing fee to: American Arbitration Association, 601 Pennsylvania Avenue, N.W., Suite 700, Washington, D.C. 20004;

    iii.      Send one copy of the demand for arbitration to XM SATELLITE RADIO INC.  In the arbitration proceeding, the arbitrator must follow applicable law, and any award may be challenged if the arbitrator fails to do so.  Otherwise, the arbitrator's decision is final and binding on all parties and may be enforced in any federal or state court that has jurisdiction.  A court may sever any portion of this Section 11 that it finds to be unenforceable.

**c) Exceptions**.
Notwithstanding the foregoing:

    i.      any dispute over the validity of either party's intellectual property rights or our licenses to operate our business;

    ii.      any Claim based on Section 11(b) above; and

    iii.      any dispute involving a violation of the Communications Act of 1934, 47 U.S.C. § 605, or the Electronic Communications Privacy Act, 18 U.S.C. §§2510-2521,
may be decided only by a court of competent jurisdiction.

Nothing in this Agreement shall affect our ability to terminate your Services for non-payment of amounts owed to us when due. Furthermore, nothing in this Agreement will prevent us from bringing an action in a court of competent jurisdiction in order to collect any unpaid amounts.

Customer Service Agreement, p. 8, Exh. 1 attached to Dkt. #2.  Additionally, Paragraph 12(b)

stated:

> The interpretation and enforcement of this Agreement shall be governed by the
> rules and regulations of the Federal Communications Commission ["FCC"],
> other applicable federal laws, and the laws of the state and local area where
> Service is provided to you. This Agreement is subject to modification if required
> by such laws.  Notwithstanding the foregoing, Section 11 shall be governed by
> the Federal Arbitration Act ["FAA"].

Customer Service Agreement, p. 8, Exh. 1 attached to Dkt. #2.

On January 31, 2006, Defendants moved this Court to dismiss, or alternatively, to stay

the action due to pending arbitration.  The issue initially decided by the Court was whether it was

for the Court or an arbitrator to determine the threshold issue of arbitrability.  Ultimately, the

Court held that Plaintiff's challenge to the validity of the arbitration clause was not subject to

arbitration.  On April 18, 2007, the Eighth Circuit Court of Appeals affirmed the Court's ruling

that it was for the Court to determine the threshold issue of arbitrability.

In 2007, Defendants amended the arbitration provision in the Agreement (also referred to

as the "2007 Agreement") to read as follows:

> **b) Formal Resolution**.
> If we cannot resolve a Claim informally, any Claim shall be resolved solely by
> binding arbitration, and the arbitrator shall also have the sole authority to decide,
> without limitation, any question regarding the existence, scope or validity of this
> arbitration provision.  Notice of any Claim must be provided as set forth in
> Section 11(a).  The arbitration will be conducted under the Commercial
> Arbitration Rules and the Supplementary Procedures for Consumer-Related
> Disputes of the American Arbitration Association (collectively, the "AAA Rules")
> that are in effect at the time the arbitration is initiated and under the rules set forth
> in this Customer Agreement. If there is a conflict between the AAA Rules and the
> rules set forth in this Customer Agreement, the rules set forth in this Customer
> Agreement will govern. ARBITRATION MEANS THAT YOU WAIVE YOUR
> RIGHT TO A JURY TRIAL. If you initiate an arbitration, you agree to pay a fee
> of $125 or, if less and you tell us in writing, the amount that you would pay to

initiate a lawsuit against us in the appropriate court of your state.  We agree to pay any additional fee or deposit required by the American Arbitration Association in excess of your filing fee.  We also agree to pay the costs of the arbitration proceeding up to a maximum of one-half day (four hours) of hearings.  Other fees, such as attorney's fees, expenses or travel to the arbitration and the costs of a proceeding that goes beyond one-half day will be with AAA rules.  The arbitration will be held at a location within 100 miles of your residence unless you and we both agree to another location.  To start the arbitration, you or we must do the following things:

    i.     Write a demand for arbitration.  The demand must include a description of the Claim and the amount of damages sought to be recovered;

    ii.    Send two copies of the demand for arbitration plus the appropriate filing fee to: American Arbitration Association, 1776 Eye Street, N.W., Suite 850, Washington, D.C. 20006; and

    iii.   Send one copy of the demand for arbitration to XM SATELLITE RADIO INC. at the address on the first page of this Customer Agreement.

Notwithstanding the foregoing provisions of this subsection, you and we both retain the right to seek relief in an appropriate small claims court for disputes or claims that fall within the scope of its jurisdiction.

**c) Binding Effect.**
In the arbitration proceeding, the arbitrator must follow applicable law, and any award may be challenged if the arbitrator fails to do so.  Otherwise, the arbitrator's decision is final and binding on all parties and may be enforced in any federal or state court that has jurisdiction.  Upon judicial review of an arbitrator's decision, a court may sever any portion of this Section 11 that it finds to be unenforceable.

**d) Exceptions.**
Notwithstanding the foregoing:

    i.     any dispute over the validity of either party's intellectual property rights or our licenses to operate our business;

    ii.    any dispute based on Section 11(c) above challenging or enforcing the arbitrator's award or decision; and

    iii.   any dispute involving a violation of the Communications Act of 1934, 47 U.S.C. § 605, or the Electronic Communications Privacy Act, 18 U.S.C. §§2510-2521

may be decided only by a court of competent jurisdiction.

Nothing in this Customer Agreement, including, without limitation, this Section 11, shall affect our ability to terminate your Services for non-payment of amounts owed to us when due. Furthermore, nothing in this Customer Agreement, including, without limitation, this Section 11, will prevent us from bringing an action in a small claims court of competent jurisdiction in order to collect any unpaid amounts.  If collection activities are required in order for us to collect money you owe us, you agree to pay the reasonable costs of such collection, including, but not limited to costs of a collection agency, attorney's fees and court costs.

---

NOTICE OF ARBITRATION AGREEMENT:

This agreement provides that all disputes between you and XM will be resolved by <u>BINDING ARBITRATION</u>.

You thus GIVE UP

YOUR RIGHT TO GO TO COURT to assert or defend your rights under this contract (EXCEPT for matters that may be taken to SMALL CLAIMS COURT).

*Your rights will be determined by a NEUTRAL ARBITRATOR and NOT a judge or jury.

*You are entitled to a FAIR HEARING, BUT the arbitration procedures are SIMPLER AND MORE LIMITED THAN RULES APPLICABLE IN COURT.

*Arbitrator decisions are as enforceable as any court order and are subject to VERY LIMITED REVIEW BY A COURT.

<u>FOR MORE DETAILS</u>,

See Section 11 above.

---

Customer Service Agreement, p. 10-11, Exh. 2 attached to Dkt. #68.  Additionally, Paragraph

12(b) now states:

The interpretation and enforcement of this Customer Agreement shall be governed by the rules and regulations of the Federal Communications Commission, other

applicable federal laws, and the laws of the state and local area where Service is provided to you in that order.  This Customer Agreement is subject to modification if required by such laws.  Notwithstanding the foregoing, Section 11 shall be governed solely by the Federal Arbitration Act without reference to state law.

Customer Service Agreement, p. 11, Exh. 2 attached to Dkt. #68.

Remaining for determination are the issues raised in Defendants' Motion to Dismiss and supplemental filings regarding the validity and applicability of the arbitration clause to this case. If the Court finds that this case is not arbitrable, the Court must also reach the merits of Defendants' Motion to Dismiss, including the issue of whether Defendants' broadcasts contain commercials under FCC regulations and other applicable laws.  To determine the arbitrability of this dispute, the Court must determine whether an agreement to arbitrate exists, and if so, which agreement to arbitrate now applies.  Then, the Court must determine whether the agreement is valid, and whether the dispute falls within the scope of the arbitration provisions.

## II.    MUTUAL AGREEMENT & NOTICE

"A threshold inquiry is whether an agreement to arbitrate exists; that is, whether there has been mutual agreement, with notice as to the terms and subsequent assent."  *Alltel Corp. v. Sumner*, 360 Ark. 573, 576, 203 S.W.3d 77, 80 (2005).  The Court must "keep in mind two legal principles when deciding whether a valid contract was entered into: (1) a court cannot make a contract for the parties but can only construe and enforce the contract that they have made; and if there is no meeting of the minds, there is no contract; and (2) it is well settled that in order to make a contract there must be a meeting of the minds as to all terms, using objective indicators." *Id*.  "Both parties must manifest assent to the particular terms of the contract."  *Id.*

In *Hill v. Gateway 2000, Inc.*, 105 F.3d 1147, 1148 (7th Cir. 1997) (applying the Uniform Commercial Code), the plaintiffs purchased a computer over the telephone. The box arrived, containing the computer and a list of terms (including an arbitration clause) which state that the terms govern unless the customer returns the computer within 30 days. *Id*. The plaintiffs conceded noticing the statement of terms, but denied reading it closely enough to discover the agreement to arbitrate. *Id*. The plaintiffs kept the computer for more than 30 days before complaining, and subsequently, filed suit in federal court. *Id*. The court noted that "*Pro CD, Inc. v. Zeidenberg*, 86 F.3d 1147 (7th Cir. 1996), holds that terms inside a box of software bind consumers who use the software after an opportunity to read the terms and to reject them by returning the product." *Id*. Ultimately, the Court remanded the case to the district court with instructions to compel arbitration. *Id*. at 1151. *But see Klocek v. Gateway, Inc.*, 104 F. Supp. 2d 1332 (D. Kan. 2000) (applying the Uniform Commercial Code) (refusing to compel arbitration because Gateway had not provided evidence sufficient to support a finding under Kansas or Missouri law that plaintiff agreed to the arbitration provision contained in Gateway's Standard Terms where the Standard Terms were enclosed inside the computer box).

Defendants argue that by his own count, Plaintiff subscribed four times to XM's service: on or about June 1, 2003,[1] March 26, 2004,[2] June 2005[3] and September 2005.[4]  Defendants state that Plaintiff would have seen and clicked his assent with the Agreement when he initially registered online in June 2004.  Defendants also state that one step in the on-line activation process required a subscriber to click on a box next to the statement, "I have read and agree to the Terms and Conditions."  The phrase "Terms and Conditions" in that statement was a hyperlink to the Agreement, and in the lower right-hand corner of each page of the website, a "Terms & Conditions" hyperlink can be found.  Defendant states that an on-line subscriber could not activate XM Service without checking the box acknowledging agreement to XM's terms and conditions.

However, Plaintiff notes that the actual Agreement does not automatically appear on the customer's screen, but only appears if the customer clicks on the hyperlink.  Plaintiff further states that the system does not require that a customer click on the hyperlink and scroll through the Agreement before allowing the customer to proceed.

---

[1]Plaintiff opened an account with XM Radio on or about June 1, 2003 for use in his boat, but he deactivated his account via telephone for the period November 3, 2003 through March 25, 2004, while his boat was in storage.  Plaintiff's account summary indicates that he activated the account in June 2003 via the internet, as web activation fees were applied in June 2003.

[2]Plaintiff reactivated his account via telephone when he took his boat out of storage, and kept the account active until May 2005, at which time Plaintiff sold his boat and the radio.

[3]Plaintiff activated this account via telephone when he purchased a 2003 Tahoe, with a factory installed XM radio, in June 2005.

[4]Plaintiff added an XM-PCR, which is an XM radio to be used in conjunction with a personal computer, to his account via telephone in September 2005.

Defendants also argue that Plaintiff agreed to the Agreement when he ordered services over the telephone in March 2004, June 2005, and September 2005.  Defendants state that XM's telephone representatives followed a script in connection with telephone activations as follows:

> Mr./Mrs. _____, there is Customer Agreement that covers all the terms and conditions of your service including a requirement that you must be at least 18 years old.  You can find it on our website, xmradio.com, and we will include a copy in the Customer Welcome Kit you will receive within two to three weeks . . .

Additionally, Defendants state that each subscriber is mailed the XM welcome kit with a hard copy of the Agreement.  Defendants conclude that Plaintiff would have received the Agreement at least three times.  However, Plaintiff notes that the Agreement that arrives with the welcome kit may or may not be a currently applicable edition because XM "just us[es] up the old ones" first, so "the current version that is effective is the one that's online, notwithstanding the version you have received."  Exhibit 1, 30(b)(6) Dep., p. 112, attached to Docket # 69.

Defendants assert that Plaintiff accepted the terms when he did not cancel his services within three days of initiation, as required by the opening paragraph of the Agreement, which states:

> IF YOU DO NOT ACCEPT THESE TERMS, PLEASE NOTIFY US IMMEDIATELY AND WE WILL CANCEL YOUR SERVICES (OUR CONTACT INFORMATION IS LISTED BELOW).  IF YOU DO NOT CANCEL YOUR SERVICES WITHIN 3 DAYS OF INITIATION OF YOUR SERVICES AND INSTEAD CONTINUE TO RECEIVE YOUR SERVICES, IT WILL MEAN THAT YOU ACCEPT THESE TERMS AND THAT THEY WILL BE LEGALLY BINDING ON YOU.

Defendants further assert that Plaintiff accepted the 2007 changes to the Agreement through his continued receipt of services after notice of the changes.  Section 2 of the original Agreement states:

> Due to the evolving nature of our business, its competition, and the requirement and costs of programming suppliers, we reserve the right to change the terms on which we offer the Services from time to time, as we believe appropriate, including the fees and charges.  If we make any such changes, we will send you a notice describing them and their effective date, in the manner described in Section 12(a),[5] or we will send you an entirely new Agreement to replace this Agreement.  You always have the right to cancel the Services at any time if these terms are not acceptable to you.  If you elect not to cancel your Services after receiving our notice of a change, your continued receipt of Services from us will constitute acceptance of the changed terms.  If you notify us that you do not accept such terms, then we may cancel your Services as provided in Section 8.

Defendants state that Plaintiff's account contact information contains his e-mail address, which shows that XM sends information, including notices, to him by e-mail, and XM has no record of Plaintiff requesting that he not be contacted by e-mail.  Defendant further states that on or about June 15, 2007, and June 29, 2007, XM included in its weekly e-mails to subscribers, including Plaintiff, an Announcement titled "Notice of Changes to XM Customer Agreement," which described the changes to the Agreement that became effective on January 1, 2007.

Defendants also argue that Plaintiff has made certain admission that preclude him from contending that he was not sufficiently aware of the Agreement's arbitration provision. Specifically, Defendant states that in his brief on XM's appeal to the Eighth Circuit, Plaintiff stated that "the terms of the service agreement that are in issue in the District Court action are those terms entered into between the parties in 2005 when Enderlin began service on the factory installed XM radio in his new Tahoe," that "the parties can and did agree when and which of the

---

[5]Section 12(a) provides, "Notices to you will be deemed given when deposited in the mail or on the date that an e-mail is sent.  Mailed notices may be included in our statements or e-mails to you.  We may also provide notice to you by telephone, which will be deemed given when a message is left with you or someone answering the telephone at your residence or commercial establishment.  Your notices to us will be deemed given when we receive them at the address (regular or e-mail) or telephone number set forth on the first page of this Agreement."

AAA Rules would apply," and that "[i]n fact, the parties, in accordance with the AAA Rules,

agreed in writing to a variance from the AAA Rules of procedure . . .."

The Court finds Defendants' arguments convincing.  Plaintiff had the opportunity to read,

and in fact confirmed that he "read and agree[d] to the Terms and Conditions", when he activated

his account in June of 2003.  *Casteel v. Clear Channel Broadcasting, Inc*., 254 F. Supp. 2d 1081,

1089 (W.D. Ark. 2003) (citing *Banks v. Evans,* 347 Ark. 383, 64 S.W.3d 746 (2002), which

reaffirmed the general rule that "one is bound to know the content of a document one signs, and

if the signer has had the opportunity to read it before she signs it, she cannot escape the

obligations imposed by the documents by merely stating that it was signed without reading it.").

Furthermore, Plaintiff continued to receive XM's services after XM sent notice of the 2007

changes to the Agreement.  Therefore, Plaintiff assented to the arbitration agreements contained

in both the original Agreement and the 2007 Agreement.

## III.    APPLICABLE ARBITRATION PROVISION

Defendants argue that the 2007 version of the arbitration provision applies, and that it

explicitly provides the arbitrator has authority to decide questions regarding the existence, scope

and validity of the arbitration provision.  Thus, Defendants argue that the Court could refer the

issues of arbitrability and the applicability of the current version of the Agreement to the

arbitrator.

Defendants argue that the 2007 changes to the arbitration clause in the Agreement applies

to this on-going litigation because Plaintiff accepted the changes by continuing to receive XM's

services.  *See Davidson v. Cingular Wireless LLC*, 2007 WL 896349, *6 (E.D. Ark. 2007)

("Finally, because the 2006 WSA was 'effective on receipt' and Plaintiff did not opt to reject the

11

new WSA, the 2006 WSA governs."). *See also Kristian v. Comcast Corp.*, 446 F.3d 25, 33 (1st Cir. 2006) (finding that the language "any claim or dispute arising out of this agreement *or the services provided*" covers claims retroactively) (distinguishing *Security Watch, Inc. v. Sentinel Systems, Inc.,* 176 F.3d 369 (6th Cir.1999) (finding no retroactivity in an arbitration clause that read " '[t]he parties shall follow these dispute resolution processes in connection with all disputes, controversies or claims ... arising out of or relating to the Products furnished pursuant to *this* Agreement or acts or omissions of Distributor or AT& T under *this* Agreement.' "); *Choice Security Systems, Inc. v. AT & T Corp.,* 141 F.3d 1149 (Table), 1998 WL 153254 (1st Cir. Feb. 25, 1998) (unpublished) (finding no retroactivity in an arbitration provision that read "all disputes ... arising out of or relating to the products furnished pursuant to *this* Agreement.").

Paragraph 11 of the original Agreement defines a "Claim" as "any legal or equitable claim relating to this Agreement, or *the Services*." (Emphasis added).  Paragraph 11 of the 2007 Agreement defines a "Claim" as "any dispute, claim or controversy arising out of or relating to *the Services*, this Customer Agreement or the breach, termination, enforcement, interpretation or validity thereof." (Emphasis added).

The Court agrees with Defendants that the 2007 Agreement governs this dispute. Plaintiff does not argue that he never received the notice of the changes; nor does he argue that he even attempted to discontinue his services in order to reject the 2007 changes.  Furthermore, the Court finds that the reference to "the Services" in both the original Agreement and 2007 Agreement indicate that changes apply retroactively.

However, the Court declines to submit the questions regarding the existence, scope and

validity of the arbitration provision to the arbitrator.  As stated in its previous opinion, the Court

notes in *Barker v. Golf U.S.A., Inc.*, 154 F.3d 788, 791 (8th Cir. 1998), the Eighth Circuit

determined that it was for the court, rather than an arbitrator, to decide the validity of an

arbitration clause when claims were made that the arbitration clause lacked mutuality of

obligation, was unconscionable, and violated public policy.

## IV.     GOVERNING LAW

Defendants argue that the claims asserted by Plaintiff fall within the scope of a valid,

enforceable arbitration provision subject to the FAA.  Alternatively, Defendants argue that even

if Arkansas state law of contract construction applies, the Agreement contains a valid,

enforceable arbitration provision.  Plaintiff argues that the arbitration agreement is unenforceable

because it is lacks mutuality and it is unconscionable, both procedurally and substantively.

Defendants assert that the arbitration provisions are subject to the FAA because the

Agreement provides that the dispute resolution provisions are governed by the FAA, and the

arbitration clause falls squarely within the statutory language of 9 U.S.C. § 2.  Clearly, the

language of the contract states that Section 11, the arbitration provision, "shall be governed by

the Federal Arbitration Act."  9 U.S.C. §§ 1-16 (1994).

The Federal Arbitration Act provides:

> A written provision in any . . . contract evidencing a transaction involving
> commerce to settle by arbitration a controversy thereafter arising out of
> such contract or transaction, or the refusal to perform the whole or any part
> thereof, or an agreement in writing to submit to arbitration an existing
> controversy arising out of such a contract, transaction, or refusal, shall be
> valid, irrevocable, and enforceable, *save upon such grounds as exist at law*

13

*or in equity for the revocation of any contract.*

9 U.S.C.A. § 2 (emphasis added).  Furthermore, the Federal Arbitration Act requires that the Court first be "satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue" before compelling arbitration.  *See* 9 U.S.C.A. § 4.

Therefore, although the arbitration provision is governed by the FAA, "[t]o decide whether the parties' agreement to arbitrate is valid, [the Court must] look to state contract law." *Barker v. Golf U.S.A., Inc.*, 154 F.3d 788, 791 (8th Cir. 1998).  The Court "may apply state law to arbitration agreements only to the extent that it applies to contracts in general."  *Id.* (citing *Allied-Bruce Terminix Cos. v. Dobson,* 513 U.S. 265, 281, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995)).  "Put another way, [a court] may not invalidate an arbitration agreement under any state law applicable only to arbitration provisions; instead, [the court] may apply only a state's general contract defenses."  *Id.* (citing *Doctor's Assocs. v. Casarotto,* 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996).

"What States may not do is decide that a contract is fair enough to enforce all its basic terms (price, service, credit), but not fair enough to enforce its arbitration clause. The Act makes any such state policy unlawful, for that kind of policy would place arbitration clauses on an unequal 'footing,' directly contrary to the Act's language and Congress' intent."  *Allied-Bruce Terminix Companies, Inc. v. Dobson*, 513 U.S. 265, 281, 115 S.Ct. 834, 843 (1995).  *See also E.E.O.C. v. Waffle House, Inc*., 534 U.S. 279, 293, 122 S.Ct. 754, 764 (2002) ("The FAA directs courts to place arbitration agreements on equal footing with other contracts, but it does not require parties to arbitrate when they have not agreed to do so.").

14

Plaintiff argues that the arbitration agreement is unenforceable because it is lacks mutuality and it is unconscionable, both procedurally and substantively.  The United States Supreme Court has stated that "generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2."  *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 687, 116 S.Ct. 1652, 1656 (1996). Additionally, under Arkansas law, "the essential elements of a contract include: (1) competent parties, (2) subject matter, (3) legal consideration, (4) mutual agreement, and (5) mutual obligations."  *E-Z Cash Advance, Inc. v. Harris*, 347 Ark. 132, 138, 60 S.W.3d 436, 440 (2001). *See also Alltel Corp. v. Sumner*, 360 Ark. 573, 576, 203 S.W.3d 77, 79 (2005) ("The same rules of construction and interpretation apply to arbitration agreements as apply to agreements in general. Thus, the essential elements for an enforceable arbitration agreement are (1) competent parties, (2) subject matter, (3) legal consideration, (4) mutual agreement, and (5) mutual obligation.").   As such, lack of mutual obligations is a generally applicable contract defense. Therefore, clearly, lack of mutuality and unconscionability may be applied to invalidate arbitration agreements.

The question then becomes whether the Court may require mutuality within an arbitration provision of the contract, but not as to each other provision separately.  Defendant argues that Arkansas law requiring mutuality within the arbitration paragraph itself would be preempted because it violates the FAA by giving such clause unequal footing with other contract terms that do not each have to be mutual, such other contract terms requiring mutuality only as to the contract as a whole.  Plaintiff argues that the arbitration provision is treated as a separate contract.  Plaintiff notes that Paragraph 11(b)(iii) of the Agreement provides, "A court may sever

any portion of this Section 11 that it finds to be unenforceable."  Also, Paragraph 12(d) of the Agreement provides, "If any provision is declared by a competent authority to be invalid, that provision will be deleted or modified to the extent necessary, and the rest of this Agreement will remain enforceable."  Plaintiff argues that under the FAA, a court may only analyze the validity of an arbitration agreement on the same law that applies to contracts in general, and thus, mutuality within the arbitration provision is required.

In *Barker*, plaintiffs claimed that defendant's promise to arbitrate was illusory and lacked mutuality because "any claim can be converted into a claim for monies owed to Golf U.S.A. pursuant to the agreement, and, as a result, Golf U.S.A. is permitted to litigate any conceivable claim, while they must arbitrate their claims."  *Barker v. Golf U.S.A., Inc.*, 154 F.3d 788, 791 (8th Cir. 1998) (applying Oklahoma law).  The Eighth Circuit, noting that Oklahoma had not ruled on the issue of whether mutuality of obligation is required in an arbitration clause, found that the Oklahoma Supreme Court would hold that mutuality in arbitration clauses is not required.  *Id.*  There, the court noted that "[a] doctrine that required separate consideration for arbitration clauses might risk running afoul of [the strong federal policy favoring arbitration]."  *Id.* at 792 (citing *Doctor's Assocs.,* 66 F.3d at 453).

However, in *The Money Place, LLC v. Barnes*, 349 Ark. 411, 414 (2002), the Arkansas Supreme Court expressly stated, "mutuality within the arbitration agreement itself is required, and that analysis depends on Arkansas contract law."  Additionally, the Arkansas Supreme Court noted that "several federal courts have found that lack of mutuality to arbitrate in arbitration clauses renders the clauses void as to the bound party", and that "it is state law that must be considered to determine an obligation of mutuality."  *Showmethemoney Check Cashers, Inc. v.*

16

*Williams*, 342 Ark. 112, 120-121 27 S.W.3d 361, 366 (2000) (citing *Hull v. Norcom, Inc.,* 750

F.2d 1547 (11th Cir. 1985)(determining that New York law required mutual obligations to

arbitrate to render the clause valid, and because the arbitration agreement only required one of

the parties to submit to arbitration, while the other party did not have to, the provision was

invalid because there was no mutuality of consideration)[6]; *Gibson v. Neighborhood Health*

*Clinics, Inc.,* 121 F.3d 1126 (7th Cir. 1997) (determining that Indiana law required mutual

obligations to arbitrate to render the clause valid, and also concluded that it could not find other

consideration in the contract to balance one parties' obligation to arbitrate where the other party

was not required to)).

Regarding severability, in *Prima Paint Corp. v. Flood & Conklin Mfg. Co*., 388 U.S. 395,

402, 87 S.Ct. 1801, 1805 (1967), the United States Supreme Court upheld the Second Circuit's

opinion, which found that "except where the parties otherwise intend–arbitration clauses as a

matter of federal law are 'separable' from the contracts in which they are embedded . . . ." As

noted by the Sixth Circuit, *Prima Paint* may "arguably be interpreted as implying that an

arbitration clause is an independent contract that is separable from the main contract in which it

is found and therefore must have all of the essential elements of a contract . . . ." *Wilson Elec.*

*Contractors, Inc. v. Minnotte Contracting Corp*., 878 F.2d 167, 169 (6th Cir. 1989) (citing *Prima*

*Paint*, 388 U.S. at 409-11, 87 S.Ct. at 1808-10 (J. Black dissenting)).   However, the Sixth

---

[6]The Court notes that New York subsequently overruled its mutuality requirement.
*Sablosky v. Edward S. Gordon Co.*, 73 N.Y.2d 133, 137, 535 N.E.2d 643, 646 (1989)
("Mutuality of remedy is not required in arbitration contracts.  If there is consideration for the
entire agreement that is sufficient; the consideration supports the arbitration option, as it does
every other obligation in the agreement.").

Circuit opined that in light of cases, such as *Perry v. Thomas,* 482 U.S. 483, 107 S.Ct. 2520, 2527 n. 9, 96 L.Ed.2d 426 (1987) (stating that arbitration agreements should not be construed by the courts in a manner different from nonarbitration agreements), such an interpretation would be inappropriate.  *Id.  See also Glazer v. Lehman Bros., Inc*., 394 F.3d 444 (6th Cir. 2005) (concluding that "arbitration provisions, although severable insofar as they are considered in determining whether a contractual dispute should be submitted to arbitration, are not 'separate, independent and distinct contracts").[7]

---

[7]Courts are split regarding whether consideration from an underlying contract, or continued employment, can support an arbitration clause and render it enforceable. *Cheek v. United Healthcare of Mid-Atlantic, Inc*., 378 Md. 139, 157, 835 A.2d 656, 667 (2003)(disagreeing with cases holding that consideration for an underlying contract can serve as consideration for an arbitration agreement within the contract, even when the arbitration agreement is drafted so that one party is absolutely bound to arbitrate all disputes, but the other party has the sole discretion to amend, modify, or completely revoke the arbitration agreement at any time and for any reason and noting that to find such the court would be precluded from ever finding an arbitration agreement invalid for lack of consideration when performance of a contract has already occurred, no matter how illusory the arbitration agreement) (citing *Blair v. Scott Specialty Gases*, 283 F.3d 595, 604 n. 3 (3rd Cir. 2002) (noting in dicta that continued employment may serve as consideration for an agreement to arbitrate); *Barker v. Golf U.S.A., Inc*., 154 F.3d 788, 792 (8th Cir. 1998) (concluding that under Oklahoma law, "mutuality of obligation is not required for arbitration clauses so long as the contract as a whole is supported by consideration"); *Doctor's Assocs., Inc. v. Distajo*, 66 F.3d 438, 453 (2nd Cir.1995) (stating that Connecticut courts would conclude that when an arbitration agreement is integrated into a larger contract, consideration for the contract as a whole would cover the arbitration clause as well); *Wilson Electrical Contractors, Inc. v. Minnotte Contracting Corp*., 878 F.2d 167, 169 (6th Cir.1989) (finding that arbitration clause within larger contract did not require consideration independent from consideration of larger contract; also stating that *Prima Paint*, *supra*, "does not require separate consideration for an arbitration provision contained within a valid contract."); *Avid Engineering, Inc. v. Orlando Marketplace Ltd.*, 809 So.2d 1, 4 (Fla.Dist.Ct.App.2001) ("Because there was sufficient consideration to support the entire contract, the arbitration provision was not void for lack of mutuality of obligation."); *Sablosky v. Edward S. Gordon Co.*, 73 N.Y.2d 133, 538 N.Y.S.2d 513, 535 N.E.2d 643, 646 (1989) ("If there is consideration for the entire agreement that is sufficient; the consideration supports the arbitration option, as it does every other obligation in the agreement.")).

The Court agrees with Defendants' contention that Arkansas law requiring mutuality within the arbitration paragraph itself is preempted by the FAA because it places the arbitration clause on unequal footing with other contract terms that do not each have to be mutual.  The Court heeds the Eighth Circuit's warning in *Barker* that a doctrine requiring separate consideration for arbitration clauses might violate federal policy.  Thus, the Court need only consider whether the arbitration provision is unconscionable.

## III.    VALIDITY OF THE ARBITRATION CLAUSE

"A court's role under the FAA is limited to determining (1) whether a valid agreement to arbitrate exists, and if it does, (2) whether the agreement encompasses the dispute."  *Pro Tech Industries, Inc. v. URS Corp*., 377 F.3d 868, 871 (8th Cir. 2004).   Plaintiff, the party opposing arbitration, has the burden of proving the arbitration provision is unconscionable.  *Id*. at 873.  "Generally, when deciding whether an arbitration provision is unconscionable, courts apply ordinary state-law principles governing the formation of contracts."  *Id*. at 872.

The Arkansas Supreme Court has adopted the following test for determining unconscionability in contract cases:

> In assessing whether a particular contractual provision is unconscionable, courts should review the totality of the circumstances surrounding the negotiation and execution of the contracts. Two important considerations are whether there is a gross inequality of bargaining power between the parties and whether the aggrieved party was made aware of and comprehended the provision in question.

*Casteel v. Clear Channel Broadcasting, Inc*., 254 F. Supp. 2d 1081, 1089 (W.D. Ark. 2003) (citing *State v. R & A Inv. Co.,* 336 Ark. 289, 296, 985 S.W.2d 299 (1999)).

When addressing the alleged unconscionability of arbitration agreements, courts have divided their analysis into two categories: (1) procedural and (2) substantive.  *Davidson v.*

*Cingular Wireless LLC*, 2007 WL 896349 (E.D. Ark. March 23, 2007).  In *Circuit City Stores,*

*Inc. v. Mantor*, 335 F.3d 1101, 1105-06 (9th Cir. 2003), the Ninth Circuit explained that "a

contract to arbitrate is unenforceable under the doctrine of unconscionability when there is 'both

a procedural and substantive element of unconscionability," "[b]ut procedural and substantive

unconscionability 'need not be present in the same degree.'" (internal citations omitted).  "[T]he

more substantively oppressive the contract term, the less evidence of procedural

unconscionability is required to come to the conclusion that the term is unenforceable, and vice

versa."  *Id.*

### A.     Procedural Unconscionability

"Procedural unconscionability refers to a situation where a term is so difficult to
find, read, or understand that the plaintiff cannot fairly be said to have been aware
he was agreeing to it." *Kinkle v. Cingular Wireless LLC*, 857 N.E.2d 250, 254 (Ill.
2006). Courts look to the circumstances surrounding the transaction including the
manner in which the contract was entered into, whether each party had a
reasonable opportunity to understand the terms of the contract, and whether
important terms were hidden in a maze of fine print.  *Id.*

*Davidson v. Cingular Wireless LLC*, 2007 WL 896349, *5 (E.D. Ark. March 23, 2007).  "One

factor courts consider to determine whether a contract is procedurally unconscionable is whether

the contract is oppressive", which has been defined as "springing from an inequality of

bargaining power [that] results in no real negotiation and an absence of meaningful choice."

*Mantor*, 335 F.3d at 1106 (internal quotation marks and citations omitted).  "Another factor

courts look to is surprise, defined as 'the extent to which the supposedly agreed-upon terms of

the bargain are hidden in the prolix printed form drafted by the party seeking to enforce the

disputed terms.'"  *Id.*

In *Davidson*, Judge Wilson rejected plaintiff's argument that she should not be bound by the arbitration agreement because the service provider prepared the arbitration provision "unilaterally from a grossly-superior bargaining position," the arbitration provision was presented on a "take-it-or-leave-it" basis, and the agreement was "a litany of 'Terms and Conditions' . . . buried on the reverse of an invoice." 2007 WL 896349, at *5.  The court found that the agreement was not procedurally unconscionable because the plaintiff "had time to consider the arbitration provision, she agreed to two or more contracts since this case arose, and she has not opted to reject the arbitration provision as allowed in the 2006 revision."  *Id*. at *6.  *See also Faber v. Menard, Inc*., 367 F.3d 1048 (8th Cir. 2004) ("Mere inequality in bargaining power does not make the contract automatically unconscionable . . . and is not enough by itself to overcome the federal policy favoring arbitration.").

Conversely, in *Mantor*, the Ninth Circuit found that the arbitration agreement was procedurally unconscionable because the employee did not have "a *meaningful* opportunity to opt-out of the arbitration program."  335 F.3d at 1106.  There, the employer pressured and even threatened the employee into assenting to the arbitration agreement under pain of forfeiting his future with the company.  *Id*. at 1106.  The court stated that "[a]t a minimum, a party must have reasonable notice of his opportunity to negotiate or reject the terms of a contract, *and* he must have an actual, meaningful, and reasonable choice to exercise that discretion."  *Id*. at 1106-07.

Plaintiff argues that Defendants presented Plaintiff with an arbitration clause found in an adhesion contract to which Plaintiff had no power to negotiate terms and threatened to cancel Plaintiff's service if he did not agree to the arbitration provision.  Thus, Plaintiff argues that he did not have a meaningful choice as to the inclusion of the arbitration agreement and the

agreement is procedurally unconscionable.  Plaintiff further argues that the agreement provided

Plaintiff with three days to terminate his services, but Defendants acknowledge that it is their

practice to mail consumers a copy of the Agreement, thereby only presenting a copy of the

Agreement two to four weeks after initiation of their services.  Plaintiff also states that

Defendants do not contend that the Agreement was actually received by Plaintiff.  Finally,

Plaintiff argues that the arbitration provision is procedurally unconscionable because XM failed

to afford its customers a fair opportunity to assent to the arbitration provision.  *Specht v.*

*Netscape Communications Corp.*, 306 F.3d 17, 30 (2d Cir. 2002) ("Clarity and conspicuousness

of arbitration terms are important in securing informed consent.") (applying California law).

Defendants attempt to distinguish *Mantor* as involving the application of California

contract law, whereas the validity of the arbitration clause in this case is a matter to be considered

in light of federal and Arkansas law.  Defendants argue that Plaintiff's argument that the

arbitration provision is unconscionable because it is not sufficiently conspicuous is wrong as a

matter of law.  Defendants note that in *Davidson*, the court stated that "[t]he language of an

arbitration provision need only be as prominent as the language in the rest of the contract; it need

not be more prominent and is not required to be separately executed or initialed."  2007 WL

896349, at *6.  Defendants further argue that additional requirements would conflict with the

FAA because it would condition the enforceability of arbitration agreements on compliance with

additional requirements not applicable to contracts generally.

The Court agrees that the arbitration provision is not procedurally unconscionable.  As

discussed above, Plaintiff had the opportunity to read the arbitration provisions, which were, in

both the original Agreement and 2007 Agreement, just as prominent as the language in the rest of

the contract.  Furthermore, as shown above, the 2007 Agreement draws attention to the

arbitration provision by placing a box around the key points from the provision.  Also, Plaintiff

had the option of rejecting the terms by cancelling his services.

### B.       Substantive Unconscionability

"Substantive unconscionability looks to the actual terms of the contract to see if they are

one-sided."  *Davidson*, 2007 WL 896349, at *5.  Substantiative unconscionability includes

questions such as waiver of a class action, arbitration provisions, and requirements to seek

redress in small claims court.  *Id.*  It has also been said that "[s]ubstantive unconscionability

concerns the terms of the agreement and whether those terms are so one-sided as to shock the

conscience."  *Mantor*, 335 F.3d at 1107 (internal quotations and citations omitted).

Plaintiff argues that the arbitration agreement is substantively unconscionable because (1)

it requires the consumer to submit to binding arbitration in all matters, but allows Defendants to

seek judicial relief for any unpaid amounts without first submitting the dispute to binding

arbitration; (2) the Agreement requires Plaintiff to pay $125, or an amount equal to the filing fee

in the court of his or her state, to initiate a claim against Defendants, but provides for no waiver

of this fee; (3) effectively precludes class actions; and (4) the arbitration agreement is illusory

because XM has the right to unilaterally modify the arbitration agreement.  Generally,

Defendants assert that Plaintiff's status as an individual consumer does not automatically equate

to gross inequality of bargaining power.  Defendants also assert that part of the totality of the

circumstances is the nature of the product, a non-essential luxury entertainment item.  Defendants

further assert that if Plaintiff were truly damaged, he should have mitigated his damages by discontinuing his services, instead of re-subscribing multiple times.

First, Plaintiff argues that the arbitration agreement is substantively unconscionable because it requires the consumer to submit to binding arbitration in all matters, but allows Defendants to seek judicial relief for any unpaid amounts without first submitting the dispute to binding arbitration.  *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1173 (9th Cir. 2003) (holding unconscionable an arbitration agreement requiring employees to submit employment-related claims to arbitration, but not requiring the company to submit claims it may have against employees to arbitration); *Arnold v. United Companies Lending Corp.*, 511 S.E.2d 854, 862 (W. Va. 1998) (finding unconscionable an arbitration agreement waiving the borrower's substantial rights, including access to the courts, while preserving the lender's right to a judicial forum); *Iwen v. U.S. West Direct*, 977 P.2d 989 (Mont. 1999) (finding unconscionable an arbitration provision requiring consumers to arbitrate all claims, while entitling a publisher to pursue the collection of amounts due in a court of law).  As discussed above, Defendant contends that the arbitration provision does not lack mutuality.

Plaintiff also argues that the Agreement requires Plaintiff to pay $125, or an amount equal to the filing fee in the court of his or her state, to initiate a claim against Defendants, but provides for no waiver of this fee.  *Ingle*, 328 F.3d at 1177 (finding that the $75 filing fee substantively unconscionable, in part, because the provision did not allow for waiver in cases of indigence, as is provided for in federal court).  With regard to fee-splitting arrangements, the Eighth Circuit has stated:

24

> A fee-splitting arrangement may be unconscionable if information specific to the circumstances indicates that fees are cost-prohibitive and preclude the vindication of statutory rights in an arbitral forum. . . . The burden of showing that arbitrators' fees will be cost-prohibitive falls on the party seeking to avoid arbitration. . . . The Supreme Court has not established what quantum of proof is necessary to meet that burden. . . . We require more than just a hypothetical inability to pay, however, to overcome the federal policy favoring arbitration. . . . The party seeking to avoid arbitration should present specific evidence of likely arbitrators' fees and its financial ability to pay those fees so that the court can determine whether the arbitral forum is accessible to the party. If the party does not meet its burden, the district court must honor the arbitration agreement and compel arbitration.

*Faber v. Menard, Inc.* 367 F.3d 1048, 1053-54 (8th Cir. 2004)

Defendants argue that Plaintiff cannot credibly contend that a $125 arbitration filing fee is oppressive and unconscionable when the filing fee in this Court was $250. Defendants also state that under AAA Commercial Rule 49, a subscriber may seek a waiver of the filing fee from the AAA if it would be appropriate. Furthermore, Defendants argue that XM is required to bear the cost of (a) the difference between $125 and, if it is less than $125, the filing fee to initiate a lawsuit against XM in an appropriate court of the subscriber's state; (b) any additional fee or deposit required by the AAA in excess of the filing fee; and (c) the costs of the arbitration proceedings up to a maximum of four hours of hearing.

Additionally, Plaintiff argues that the asserted preclusion of class action relief weighs in favor of a finding of unconscionability. While Plaintiff acknowledges that the Agreement does not explicitly prohibit class actions, he asserts that "the essence of the arbitration agreement's restrictions has just that effect . . .." *Ingle*, 328 F.3d at 1175 (holding arbitration agreement substantively unconscionable because it directs arbitrators not to consolidate claims of different

employees into one proceeding, and thus, prohibits the arbitrator from hearing an arbitration as a class action).

Defendants argue that Plaintiff has omitted cases from the Ninth Circuit, such as *Jenkins v. First American Cash Advance of Georgia*, LLC, 400 F.3d 868 (11th Cir. 2006) (holding that the inclusion of a class action waiver did not render the arbitration agreement substantively unconscionable because precluding class action relief would not have the practical effect of immunizing the defendants because the consumers could vindicate their rights in arbitration), and *Randolph v. Green Tree Fin. Corp.-Ala.*, 244 F.3d 814 (11th Cir. 2001) (holding "a contractual provision to arbitrate TILA claims is enforceable even if it precludes a plaintiff from utilizing class action procedures in vindicating statutory rights under TILA"), to the contrary.  Defendants further argue that Plaintiff's contention that the absence of a class-action waiver in an arbitration clause makes the clause unconscionable has no legal support.  The Court agrees.

Finally, Plaintiff argues that the Court should hold that the arbitration agreement is illusory because, under the Agreement, XM has the right to "modify [the Customer Service Agreement] without prior notice" to the consumer.  Customer Service Agreement, Exh. 2 ¶ 10(d) and Exh. 4 ¶ 12(d) attached to Dkt. #69.  Plaintiff states that Defendants have exercised this right no less than four times since 2004, and has even undertaken to do so in the midst of an ongoing dispute.  *See Dumais v. American Golf Corp.*, 299 F.3d 1216, 1219 (10th Cir. 2002) ("We join other circuits in holding that an arbitration agreement allowing one party the unfettered right to alter the arbitration agreement's existence or its scope is illusory.") (citing cases from Fourth, Sixth and Seventh Circuits).  *But see Iberia Credit Bureau, Inc. v. Cingular Wireless LLC*, 379 F.3d 159 (5th Cir. 2004) (holding that the change-in-terms provision does not render the

contract's obligations illusory because it "can be understood as an invitation to enter into a relationship governed by the new terms" and the "customer then accepts the new terms by continuing to use the service").

Defendants argue that the Agreement has at all times required XM Radio to provide subscribers with some type of notice describing the changes and their effective date, as Section 2 of the original Agreement states, "If we make any such changes, we will send you a notice describing them and their effective date, in the manner described in Section 12(a),[8] or we will send you an entirely new Agreement to replace this Agreement," and Section 2 of the 2007 Agreement states, "if we make any material changes that, in XM's judgment, would have an adverse effect on your use of the Services, we will either post a notice on our website that the Agreement has changed and the effective date of such change, provide you a notice describing such changes and their effective date, in the manner described in Section 12(a), or send you a revised Customer Agreement to replace this Customer Agreement."  Defendants also argue that XM has never "unilaterally altered" the terms of the Agreement because the subscriber has the right to cancel the Services "if these terms are not acceptable to you," and "your continued receipt of Service from us will constitute acceptance of the changed terms."

In *Ingle v. Circuit City Stores, Inc*., 328 F.3d 1165, 1179 (9th Cir. 2003), Circuit City's arbitration agreement stated, "Circuit City may alter or terminate the Agreement and these

---

[8]Section 12(a) provides, "Notices to you will be deemed given when deposited in the mail or on the date that an e-mail is sent.  Mailed notices may be included in our statements or e-mails to you.  We may also provide notice to you by telephone, which will be deemed given when a message is left with you or someone answering the telephone at your residence or commercial establishment.  Your notices to us will be deemed given when we receive them at the address (regular or e-mail) or telephone number set forth on the first page of this Agreement."

Dispute Resolution Rules and Procedures on December 31st of any year upon giving 30 calendar days written notice to Associates," and allowed Circuit City to modify or terminate any and all dispute resolution agreements with its employees unilaterally, but afforded no such power to employees.  The Ninth Circuit concluded that the provision affording Circuit City the unilateral power to terminate or modify the contract was substantively unconscionable, noting that the notice was trivial because there was no meaningful opportunity to negotiate the terms, especially considering that the contract was adhesive.

The Court finds that the arbitration agreement is not substantively unconscionable. Importantly, the arbitration provision concerns a product that is a non-essential luxury entertainment item, rather than a person's employment or a necessity.  First, the Court notes that the 2007 Agreement states that "you and we both retain the right to seek relief in an appropriate small claims court for disputes or claims that fall within the scope of its jurisdiction." Furthermore, as stated above, Arkansas law requiring mutuality within the arbitration paragraph itself is preempted by the FAA because it places the arbitration clause on unequal footing with other contract terms that do not each have to be mutual.  Also, Plaintiff cannot demonstrate that the $125 filing fee is unconscionable, as the filing fee in this Court exceeds that amount, and Plaintiff has not disputed that a subscriber may seek a waiver of the filing fee.  Further, the Court notes that Plaintiff has failed to "present specific evidence of likely arbitrators' fees and its financial ability to pay those fees so that the court can determine whether the arbitral forum is accessible to the party."  As to the preclusion of class actions, Plaintiff has not discussed, and neither Agreement appears to preclude, the possibility of consolidation of claims within

arbitration.  Finally, as discussed above, XM does not unilaterally modify the arbitration

agreement, as Plaintiff retains the option to discontinue service to reject said modifications.

## IV.    APPLICABILITY OF THE ARBITRATION CLAUSE

The United States Supreme Court has stated that the FAA manifests "a liberal federal

policy favoring arbitration agreements."  *E.E.O.C. v. Waffle House, Inc*., 534 U.S. 279, 289, 122

S.Ct. 754, 762 (2002).  However, absent some ambiguity in the agreement, "the language of the

contract defines the scope of disputes subject to arbitration."  *Id*.  "[A]ny doubts raised in

construing contract language on arbitrability 'should be resolved in favor of arbitration.'"  *CD

Partners, LLC v. Grizzle*, 424 F.3d 795, 798 (8th Cir. 2005).

"Broadly worded arbitration clauses . . . are generally construed to cover tort suits arising

from the same set of operative facts covered by a contract between the parties to the agreement."

*Grizzle*, 424 F.3d at 798 (noting that the arbitration clause covered "any claim, controversy or

dispute arising out of or relating to Franchisee's operation of the Franchised business under the

Agreement").

It does not appear that Plaintiff contends that this claim does not fall within the scope of

the arbitration provision if the Court finds that the arbitration provision is enforceable.  As

discussed above, this purported class action lawsuit concerns alleged violations of the Arkansas

Deceptive Trade Practices Act.  The 2007 Agreement provides that "any Claim shall be resolved

solely by binding arbitration," and defines a "Claim" as "any dispute, claim or controversy

arising out of or relating to the Services, this Customer Agreement or the breach, termination,

enforcement, interpretation or validity thereof."  Furthermore, it does not appear, and Plaintiff

has not argued, that his claims fall within one of the exceptions to arbitration under the

agreement.  Therefore, the Court finds that Plaintiff's claims fall within the scope of the arbitration provision.

## <u>CONCLUSION</u>

The parties are directed to submit this case to arbitration in accordance with the terms of the Agreement, pursuant to 9 U.S.C. § 4, and this case is stayed pending resolution of the arbitration, pursuant to 9 U.S.C. § 3.  *Lyster v. Ryan's Family Steak Houses, Inc*., 239 F.3d 943, 948 (8th Cir. 2001).

Accordingly,

IT IS THEREFORE ORDERED THAT the Defendants' Motion to Dismiss, or Alternatively, To Stay (Docket #2) shall be, and is hereby, GRANTED in part as set forth above. The parties are directed to submit this case to arbitration in accordance with the terms of the Agreement.

IT IS FURTHER ORDERED THAT this case is STAYED pending resolution of the arbitration.

IT IS FURTHER ORDERED THAT Defendants' Motion to Strike Class Allegations (Docket No. 73) be, and it is hereby, DENIED without prejudice.

Dated this 25th day of March, 2008.

/s/Garnett Thomas Eisele
UNITED STATES DISTRICT JUDGE